[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal from the action of the defendant Zoning Board of the City of Stamford in granting two applications.
The first application (Application #89-037) was to rezone a combined parcel of approximately 72,000 square feet in area fronting on Summer and Franklin Streets north of North Street in downtown Stamford. The parcel had been zoned C-L (Commercial) and R-MF (Multi-family Residential). The application requested a change of zone from C-L and R-MF to an MX-D Mixed Use District.
The second application (Application #89-038) was for site plan approval. The application proposed four and five story buildings with 89 residential units and a two level 205 space parking garage on the site, while retaining two existing office buildings identified as 1200 and 1234 Summer Street. The 89 residential apartment units residential development in the four and five story structures would be oriented to Franklin Street with virtually all parking under cover and would replace existing surface parking in back of the two office buildings located at 1200 and 1234 Summer street, as well as surface parking for a third unrelated lot, the Altuwich piece, at 150 Franklin Street. The new construction was proposed as an "infill" development site under Stamford Zoning Regulations, Section 9 AAA — Mixed Use Development District.
An "infill" site is one with an MX-D use that is applied in special circumstances to parcels less than two acres within the Downtown Boundary as delineated on the master Plan. Such sites are considered infill development sites and are subject to special MX-D standards. The application of the special infill development standards is limited to the creation of new residential dwelling units in under-utilized areas of the CT Page 3053 downtown. A parcel or parcels of land containing a minimum of one contiguous acre (43,5060 sq. ft.) and a minimum of one hundred (100) linear feet of street frontage, of which no less than 50% of said frontage is either vacant or used as a parking lot at the time of the application may qualify as an infill development site under the Regulations.
The plaintiffs are seventeen owners of commercial office condominiums located at 1200 Summer Street, Stamford, Connecticut. They each acquired title from BVD Associates, a limited partnership. Plaintiffs took title subject to a recorded Declaration of Condominium. The acting General partner of BVD Associates was Bedford Equities Corporation, a subsidiary of Charter federal Savings and Loan Association.
The defendant, Burt Hoffman, Trustee, is the owner of development rights to the premises of 1200 Summer Street and an adjacent office condominium, 1234 Summer Street, having purchased these rights from the declarant, BVD Associates, in 1987 and 1988 respectively. In addition, the defendant, Burt Hoffman, Trustee is the owner of the third lot at 150 Franklin Street, known as the Altuwich lot, which abuts the parking area to the rear of 1200 Summer Street.
The three properties, 1200 Summer Street, 1234 Summer Street, and the Altuwich lot, comprise the parcel with the defendant, Burt Hoffman, Trustee, sought to rezone.
There was a public hearing on November 5, 1990, after which the applications were approved by the Zoning Board with conditions.
This appeal has been filed by the seventeen owners of office condominiums at 1200 Summer Street. Because their office condominiums are on the rezoned parcel, they are found to be aggrieved for purposes of appeal.
The Board took the following action:
 As to the application (89-037) for a change of zoning district from C-L and R-MF to MX-D Infill for property located on the west side of Summer Street and the east side of Franklin Street, the Board voted 4-0 to approve the zone change on November 19, 1990.
 As to the application (89-038) for approval of general development plans for property with the MX-D District, consisting of 89 dwelling units within a single building, bounded by Summer Street to the east and Franklin Street to the west, as more particularly CT Page 3054 shown on the submitted site plans and architectural plans, the board resolved (3-1) as follows:
 "WHEREAS the Zoning Board has conducted a duly called public hearing on November 5, 1990, and has considered the favorable comments of the Planning Board, the Dept. of Traffic and Parking, and the comments of other interested city agencies and the general public;
 WHEREAS the Zoning Board makes the following special findings:
 1. The proposed development as presented on the general site and architectural plans appears to satisfy all of the objectives of the MX-D District pertaining to "in-fill" development sites;
 2. Available public infrastructure capacity has been demonstrated to be generally capable of servicing the requirements of the general development plan;
 3. The inclusion of housing on this site is desirable and compatible with surrounding development and consistent with general planning objectives to increase housing within the downtown "collar area" and consistent with the planned upgrading of Franklin Street as a desirable residential street;
 4. The proposed parking levels and shared parking analysis are consistent with the provisions of the MX-D District standards and, if properly managed, should provide ample parking for residential and office uses.
 NOW THEREFORE BE IT RESOLVED That the Zoning Board approve the general site and architectural plans including the requested modification of front and side yard setback and parking standards, and authorize the applicant to submit final plans to the Zoning Board, subject to the following conditions:
 1. Final plans shall fully conform to Section 9-AAA and all other applicable zoning standards specifically modified as part of this approval;
 2. Final architectural detailing of streetscape and ground level walls, lighting and plantings shall be designed for public safety and attractive pedestrian amenity, with particular attention to complete screening of the garage structure;
CT Page 3055
 3. The southerly property boundary abutting the planned extension of Hoyt Street shall be respected as a future streetscape with appropriate orientation and articulation of the building and ground level landscaping;
 4. The design of access driveways and traffic operations is conditionally approved subject to final review of the Dept. of Traffic and Parking;
 5. Final plans shall include a Traffic Operations Plan, Truck Operations Management Plan, and Parking Management Plan demonstrating in particular how parking will be offered, assigned, and/or regulated to maximize the opportunity for the shared use of parking spaces held in common. The Zoning Board reserves the right to restrict any assignment or exclusive dedication of parking spaces that would serve to compromise or defeat the approved shared parking concept.
The complaint is in two counts: the first count addresses the change of zone allowed by the Board for Application 89-037; the second count addresses the Board's approval of site and architectural plans under Application no. 89-038.
As to the change of zone, the plaintiffs claimed aggrievement in that the defendant Zoning Board acted illegally, arbitrarily and in abuse of its discretion for approving said application because:
1) The use contemplated and approved is overly intensive in relation to the subject premises;
2) The Board failed to properly consider the public health, safety convenience, welfare and property values;
3) The applications were deficient in that all the owners of the property subject to said application were not signatories to said application as required by Section 9 AAA 1 of the Stamford Zoning Board regulations; and,
4) not all the property owners included in the proposed application supported and/or desired to be included in said application.
As to the site plan approval, in addition to the previous claims, the plaintiffs allege: CT Page 3056
5) The Zoning Board failed to consider and apply the parking standards set forth in Section 9AAA and Section 12 of the Stamford Zoning regulations by permitting less parking than required in said regulations;
6) The Zoning Board considered and approved a reduction in the required amount of parking without providing public notice thereof as required by Section 8-3 of the Connecticut General Statutes;
7) The Zoning Board erroneously applied a standard for parking for which there is no apparent authority;
8) The Zoning Board failed and/or neglected to consider private recorded parking rights of the plaintiffs;
9) The applicants did not submit a staging plan as required by Section 9 AAA 4a of the Stamford Zoning Regulations;
10) The application does not provide a minimum of one hundred fifty (150) square feet of usable open space per dwelling unit as required by Section 9AAA 3f of the Stamford Zoning Regulations;
11) The action of the Board constitutes an unconstitutional taking of the plaintiffs private property rights as recorded on the land records of the City of Stamford in violation of the constitution of the United states and of the State of Connecticut;
12) The Board failed to approve said application with a condition or conditions that would have appropriately addressed the plaintiffs concern about parking demand, off site impact, traffic generation and general congestion within the vicinity of the site;
13) The Zoning Board considered evidence outside the record by considering other shared parking arrangements within the City of Stamford in violation of due process of law guaranteed the plaintiffs in the Constitution of the United States and the state of Connecticut and in further violation of the Administrative Procedure Act of the State of Connecticut.
Some of these claims were not discussed in the plaintiffs' brief nor in argument and are assumed to be abandoned.
 II.
The court will address the issues briefed and argued by the plaintiffs The first claim is that in rezoning these parcels and CT Page 3057 conditionally approving the site plan, the Board failed to properly consider and promote the public health, safety and welfare.
Connecticut General Statutes Section 8-2 requires that the exercise of the zoning power be, inter alia, reasonably related to the promotion of public health, welfare and safety. Raybestos-Manhattan Inc. v. Planning and Zoning Commission,186 Conn. 466, 442 A.2d 65 (1982); A.P. W. Holding Corp. v. Planning and Zoning Board, 167 Conn. 182, 355 A.2d 91 (1974); Faubel v. Zoning Commission, 154 Conn. 202, 224 A.2d 538 (1966); Poneleit v. Duda, 141 Conn. 413, 106 A.2d 479 (1954).
The board must determine whether the application satisfies "standards set forth in the zoning regulations themselves as well as the conditions necessary to protect the public health, safety, convenience and property values." A.P. W. Holding Corp. v. Planning and Zoning Board, supra, at 185; Anastasi v. Zoning Commission, 163 Conn. 187, 190, 302 A.2d 258 (1972); C.G.S., Sec. 8-2.
The plaintiffs claim that the Board failed to consider public health, safety, convenience and welfare because it did not adequately address issues relating to traffic and parking. Moreover, in approving the applications, it did not impose conditions that dealt with concerns regarding traffic generation and general congestion within the vicinity of the site.
It is true that "One of the purposes of zoning in Stamford is to lessen congestion in the streets." Gordon v. Zoning Board, 145 Conn. 597, 601, 145 A.2d 746 (1958); Stamford Zoning Regulations, Section 1. (1988). Since an important purpose is to lessen congestion in the streets, "the new use of the property must do more than meet the wishes of the owner in carrying out his plans; it must serve the public interest in the zoning development of the community." Vece v. Zoning and Planning Commission, 148 Conn. 500, 503, 172 A.2d 619 (1961);
Kimball v. Court of common Council, 188 Conn. 97, 102,167 A.2d 706 (1961). The board is under a duty to consider the effect of constructions and use which is proposed for the new zone on the problem of traffic congestion. Vece v. Zoning and Planning Commission, supra, at 504; Gordon v. Zoning Board, supra at 604.
The plaintiffs cite a staff report dated April 10, 1990, a letter from the Planning Board dated February 28, 1990 and a letter from the Department of Traffic and Parking dated April 16, 1990, as raising various concerns, including: the new parking lot driveway and its impact on the "already congested conditions at the intersection of North and Franklin Street", CT Page 3058 curbside parking, shared parking, ingress and egress and adequacy of derived parking. They claim the Zoning Board failed to consider the existing and future traffic problems even though brought to its attention. The plaintiffs claim the Board not only failed to address and consider these concerns, but also failed to add conditions which would have properly mitigated these concerns. In fact, they assert the Board ignored most of these issues. The plaintiffs claim that, in this respect, the public health, safety, convenience and welfare was not considered when the Board approved the application.
This court has reviewed the record, including a transcript of the hearing and documents submitted by the cited agencies. Each of the agencies actually approved the proposed construction and there were no negative recommendations by the Planning Board, the Environmental Protection Board, or the Department of Traffic and Parking. The Board's staff vigorously recommended the proposal in each memo to the Board.
The Board had the benefit of studies of traffic and parking problems; studies not only by the applicant's experts but also two independent investigations by the its staff. Their conclusions were that on site parking would be improved. Off-site parking was also addressed, particularly in the study called "Available Parking Space Between North Street and Woodside Street, Off-site Parking Analysis," and sufficient available off-street parking was noted even at peak hours of use.
The Board had before it adequate information to consider the issue of traffic and parking and the Board obviously considered these issues.
Beside noting some concerns raised by the various municipal agencies, which agencies nevertheless approved the project, the plaintiffs have provided no particular evidence which would support their contention.
The Board also found and had ample evidence to support the finding that, as to sewer lines, water supply and other public services: "Available public infrastructure capacity has been demonstrated to be generally capable of servicing the requirements of the general development plan."
Moreover, the Board imposed the following conditions, among others, as to site plan approval:
 "4. The design of access driveways and traffic operations is conditionally approved subject to final review of the Dept. of Traffic and Parking;
CT Page 3059
 5. Final plans shall include a Traffic Operations Plan, Truck Operations Management Plan, and Parking Management Plan demonstrating in particular how parking will be offered, assigned, and/or regulated to maximize the opportunity for the shared use of parking spaces held in common. . ."
The plaintiffs have failed to establish their claim that the Board did not adequately consider and address issues relating to traffic and parking and in approving the applications did not impose conditions that addressed concerns regarding traffic generation and general congestion within the vicinity of the site.
 III.
The plaintiffs claim the Zoning Board failed to consider and apply the existing zoning regulations pertaining to the minimum standards for parking spaces.
Stamford Zoning Regulations Section 9AAA and 12K set forth minimum standards for parking spaces. Section 9AAA (3)(i) states in part:
 There shall be a minimum residential off-street parking requirement of one and one-quarter stalls for each unit of one bedroom or less and one and one-half spaces for each unit of two bedrooms or larger. Parking for office use shall not be more than three (3) stalls per one thousand (1,000) gross square feet of development but may not be less than 2.5 stalls per one thousand (1,000) gross square feet of development, subject to approval by the Zoning Board in accordance with the procedures and criteria of Section 12 K of these regulations, excluding the fee-in-lieu payment provision of Section 12 K. The potential for shared use of parking stalls shall constitute an additional standard for consideration of parking reduction.
Section 12 K sets forth the procedure and criteria for the Zoning Board to consider when reviewing an application for parking reduction. The plaintiffs maintain the Zoning Board failed to apply these minimum requirements in considering this application.
It is their claim that the Zoning Board failed to consider these regulations by which it is bound and failed to apply them with reasonable discretion to the facts. The plaintiffs argue CT Page 3060 that the application provides for only 205 parking spaces. They then assert that if one takes into account the number of commercial and residential units existing and proposed by this application and applies the minimum standards established in the regulations, at least 280.75 parking spaces should be provided. The plaintiffs claim that the criteria and procedures established to consider parking reductions were never considered, and in fact, ignored by the Board. They particularly note that in its recommendation dated February 28, 1990, the Planning Board of the City of Stamford stated, "the shared parking plan for 205 spaces to serve both residential and commercial components may be inadequate," and that the MX-D regulations set forth in Sections 9AAA and 12 of the zoning regulations "must be used."
The plaintiffs claim the Zoning Board's failure to apply the minimum standards of the Regulations caused it to ignore the negative effect this application would have on the community. A result of this failure to apply the regulations means that the use contemplated and approved is overly intensive in relation to the subject premises. They contend the application as proposed will interfere with the development of the area due to these problems.
These claims by the plaintiffs must be considered in the context of an MX-D Infill development, which is what the Board approved. As one staff report indicated, the proposal met all of the basic criteria for designation as an MX-D Infill Site, since it was located within the Downtown Boundary and contained more than the minimum required one acre of land and one hundred feet of frontage.
The Board's principal planner advised that the beside the objectives for "regular" MX-D projects, the additional goals of the infill MX-D can be described as the creation of new opportunities for housing, the screening of commercial development and creation of desirable residential qualities, the elimination of blighted conditions, the increase of landscape amenities, the contribution of architecture of high quality, and the improvement of site design conditions of existing commercial development. The current proposal appears to substantially meet or exceed all of these general objectives and goals, pending review of final architectural and site design details. (Return of Record, Document #26).
The Zoning Board had ample evidence that this proposal would create 89 units of housing, and would provide more parking for the current office buildings as well as parking for the occupants of the future 89 units. The area would be better landscaped, residences would be returned to a former residential CT Page 3061 area, and a parking lot would be converted into a two level parking area, nicely landscaped, with an attractive multi-family dwelling.
The reason for this conclusion was based on the regulation provision that: "The potential for shared use of parking stalls shall constitute an additional standard for consideration of parking reduction." This provision was a principal factor in the proposed use. The Board had the information provided in a staff report cited by the defendant in its brief:
 Staff in consultation with the Department of Traffic and Parking has reviewed the applicant's analysis of the opportunity for sharing of parking between residential and office uses, coupled with parking demand data for the two existing office buildings, and believes that the proposed parking will be adequate. . . Perhaps he most controversial aspect of the MX-D regulation is the encouragement of reduced parking levels and the sharing of parking in a mixed use situation. Although adopted six years ago (84-006), the current application is the first to request approval under the MX-D regulations. . . . However, the Board has never reviewed a mixed use where shared parking was feasible . . . The principal published investigation of shared parking was performed by the Urban Land Institute in 1983. . . . The MX-D regulations established a minimum standard for "peak" which cannot be further reduced by the Board. These standards are stated in the regulations — 1.5 space/two bedroom unit (1.25 space/one bedroom unit) and 2.5 spaces/1,000 sq. ft. of office. These standards define the 100% parking accumulation, or "peak" parking standard. . . . The applicant's traffic consultant, Grenier Engineering, has carefully investigated shared parking potential, including a survey of local data for residential parking demand and parking demand of the two existing office buildings on the site, . . . Figure 1 below illustrates hourly parking demand, based on the MX-D standards of 1.5 spaces/units and 2.5 spaces/1000 sf office, using the applicant's locally derived parking demand patterns for office (weekday) and residential (weekday) as reported by Grenier . . . A workable amount of parking should be available that will satisfy all users — existing office tenants are presently parked at a rate of only 2.2 spaces/1000 sf. and will enjoy a significant increase. Similarly, residential tenants will not experience any parking problems since their peak needs occur in the morning and late at night. CT Page 3062 Visitor parking for the residential units will enjoy the luxury of about 70 spaces at night and over weekends. (Return of Record, Document #26).
The Board also had information that in another development in Stamford, known as Canterbury Green, shared parking worked even though there was less available parking than proposed in this application. In Canterbury Green, there is one space per 1000, or less than 1/2 the parking in the subject application, which has 2 per thousand. Even though Canterbury Green had less parking than the subject application, the Board's staff concluded that the shared parking concept still worked. Thus, the Board had information that Canterbury Green's residential/office shared parking plan was more aggressive than the this proposal due to lower overall parking ratios and a larger percentage of office use. Consequently, the staff found that Canterbury Green achieved an effective office parking ratio or 1.96 spaces/1000 GFA. Under the same assumptions, the staff concluded the instant proposal for shared parking arrangement achieved an effective ratio of 2.70. The staff therefore I concluded that a review of canterbury Green's favorable experience with shared parking (the project is fully leased!) indicates that this parking proposal would be workable.
There was no expert opinion presented to the Board which would warrant any different conclusion.
The defendants are justified in their claim that two hundred and five Parking Spaces will easily serve the eighty-nine residential units, and increase from less than 2 to 2.5 spaces per thousand sq. ft. for the adjacent offices. Thus, the proposal is in compliance with the standards for parking in an MX-D Mixed Use "Infill" Development Site when the potential for shared use of parking stalls is utilized as a standard.
Because shared use of parking stalls is a standard and because the proposed shared stall parking arrangement met the requirements for the MX-D Development District there was no need for the applicant to apply for a special exception for reduction of parking spaces under Regulation 12K.
The court concludes that the plaintiffs have not met their burden of proof to establish that the board failed to consider and apply the regulations concerning minimum parking standards.
 IV.
The plaintiffs contend that the Board failed to consider and apply that provision of the Regulation, Section 9 AAA 1, which requires all owners of the property or their authorized CT Page 3063 agents subject to the zoning applications be signatories to the applications. Since the plaintiffs have a fee interest in the 1200 Summer Street Condominium and its common areas, they claim that the applications were defective, because only one, Burt Hoffman, Trustee, of the 22 owners whose properties are the subject of this application was a signatory to the application.
The defendants contends that, for purposes of the zoning applications, all owners of the property did sign these applications. The defendants emphasize that Section 9 AAA 1 states that ". . .all owners or their authorized agents shall be signatories to the application for redesignation [to an MX-D Mixed Development District].
The applicant, Burt Hoffman, Trustee, it is acknowledged by the plaintiffs, had purchased from the declarant involved in the Declaration of Condominium, and now owns, the development rights over 1200 Summer Street as well as 1234 Summer Street, and he owns the fee to the adjacent Altuwich property. These three parcels are the subject premises of the applications.
Article 9 of the Declaration of Condominium reserved to the declarant the development rights to add real property to the condominium and to create units, CE (Common Elements), and LCE (Limited Common Elements), and gave the declarant the authority to exercise these reserved development rights.
This article also prohibited any unit owner from interfering with the exercise of these rights.
Article 10J gave the declarant the right to apply for variances, special exceptions, zone changes and approvals consistent therewith for use of the CE incidental to the exercise of a development right or rights.
Finally, Article 10K gave the declarant the right to execute such documents as may be necessary and proper to effectuate the purposes of the exercise of those rights.
This issue was raised at the public hearing and the Board was aware that the plaintiffs opposed the application as condominium owners of 1200 Summer Street.
The Board was at liberty to accept the representations of the applicant, Burt Hoffman, Trustee, that he, in effect, had been authorized by the condominium owners to make the applications because of his ownership of the development rights and the authority granted to the owner of those rights under the provisions of the Declaration of Condominium. CT Page 3064
The Board did, therefore, consider the cited regulations and effectively applied the requirement — accepting the applicant as owner by virtue of the exercise of his development rights. Zoning is, after all, concerned with the use of property and not primarily with its ownership. Del Buono v. Board of Zoning Appeals, 143 Conn. 673, 679, 125 A.2d 915 (1956).
The plaintiffs have not established a failure of the Board to consider and apply the questioned regulation.
 V.
The plaintiffs also assert that Section 9AAA 4(a) requires the applicant to submit with each application, among other things, a "staging plan for the development indicating projected dates of construction and occupancy for all proposed structures." They allege that submission of such a plan would have permitted the plaintiffs to arrange for parking accommodations while and during the construction phases of defendant's plans. This was not filed.
It is obvious from the fact that this was a joint submission both for a change of zone and for approval of a site plan, that any final development and construction could not be predicted until the Board reviewed the applications, possibly modified the plan and imposed possible conditions.
Since, the Board conditioned its approval of the site plan on the submission of final plans to the Board and required that the plans conform to Section 9-AAA and the other approval conditions set forth in its decision, it is obvious that this provision for a staging plan would have to be complied with when it was more reasonably applicable. Thus, the plaintiffs will still be able to make suitable parking arrangements during construction when the final construction plans together with a staging plan are submitted to the Board.
 VI.
The plaintiffs next briefed a claim that the notice published by the defendant Zoning Board was defective in that it did not sufficiently apprise those affected of the applicant's request for a reduction in parking standards.
This claim is predicated on the provision of General Statutes, Sec. 8-3, which requires, as a prerequisite to a hearing, notice as to time, place, nature and character of the proposed application.
The plaintiffs state that the notice should have indicated CT Page 3065 the applicant was seeking a reduction in parking spaces. The published notice indicated only an application for a change of zone and approval of the site and architectural plans for the new zone as well as parking spaces for 205 cars. The notice did not indicate that the application was seeking a reduction in the number of required parking spaces.
Plaintiffs assert that the zoning regulations, specifically Section 9 AAA, require a minimum of 280.75 spaces for this application based upon the proposed plan submitted by the applicant. The plaintiffs claim that any request for less is a request for a reduction.
The plaintiffs cite Jarvis Acres v. Zoning Commission,163 Conn. 41, 301 A.2d 244 (1972); Wright v. Zoning Board of Appeals, 174 Conn. 488, 391 A.2d 146 (1978); Maher v. Town Planning and Zoning Commission, 154 Conn. 420, 226 A.2d 397
(1967); R.B. Kent Sons Inc. v. Planning Commission,21 Conn. App. 370, 373, 573 A.2d 760 (1990), in support of their position.
It is true that compliance with the prescribed notice requirement is a prerequisite to a valid action by the zoning board. "[T]he fundamental reason for the requirement of notice is to advise all affected parties of the opportunity to heard and to be apprised of the relief sought." Jarvis Acres v. Zoning Commission, supra, at 47; Wright v. Zoning Board of Appeals, supra, at 491. Adequate notice will enable parties having an interest to know what is projected and thus to have an opportunity to protest. Jarvis Acres v. Zoning Commission, supra; Hartford Electric Light Co. v. Water Resources Commission, 162 Conn. 89, 110, 291 A.2d 721 (1971).
"[T]he purpose behind the notice requirement of Connecticut General Statutes Section 8-3 is fairly and sufficiently to apprise those who may be affected by the proposed action of the nature and character of the proposed action so as to enable them to prepare intelligently for the hearing." Jarvis, supra.
The cases cited by the plaintiffs do enunciate the general principle that adequate notice is necessary for jurisdiction of a board for effective action, their holdings not support their position.
Jarvis found the disputed notice adequate. Wright and Maher found there was no compliance with a regulatory mandate to post a notice or to post a sign on the premises. Kent found that a generalized notice, which did not refer specifically to a location by the title Section B-2A, "it properly described the general area and approximate size of the proposed resubdivision, CT Page 3066 and the reference to the plans and related material on file was adequate to permit any member of the public to determine more precisely the specific parcels involved." Kent, supra, at 379. The court found that no one could have been misled by such notice to conclude that Section B-2A was not involved in any way.
The defendants maintain that the notice was adequate.
The notice provided:
 . . . application of Burt M. Hoffman, Trustee, requesting approval of site and architectural plans for a MX-D Infill Residential Development consisting of 89 new residential units, 59,325 sq. ft. existing office space and parking for 205 cars on property located on the west side of Summer Street and on the east side of Franklin Street . . .
A notice requirement is to fairly and sufficiently apprise those who may be affected by the proposed action so as to enable them to prepare intelligently for the hearing. The requirement does not demand verbatim text of proposals or a listing of all the possible ramifications. Balf Company v. East Granby, 152 Conn. 319, 325-26, 207 A.2d 58 (1965); Passero v. Zoning Commission, 155 Conn. 511, 515, 235 A.2d 660 (1967); Danseyar v. Zoning Board of Appeals, 164 Conn. 325, 330,321 A.2d 474 (1973).
As the defendant asserts, the notice indicated that this was a proposal for an MX-D Infill Residential Development. The regulations clearly indicate that such a development includes shared parking as a standard. Whether shared parking is reduced parking may be a matter of semantics, but the information was adequate to put the public on notice as to the property involved, describing the square footage of the existing buildings, listing the number of units of condominiums and the quantity of requested parking spaces. This would make it no more difficult for an interested party to calculate the regulatory parking requirement than to ascertain that Section B-2A was the property involved in Kent.
The notice was adequate under C.G.S. Section 8-3 and under the applicable Zoning Regulations.
 VII.
The final claim of the plaintiffs is that the Board acted illegally, arbitrarily and in abuse of its discretion by disregarding the private recorded property rights of the plaintiffs. CT Page 3067
This claim is based on the assertion that the application takes from the unit owners private recorded parking rights as provided in the Declaration of Condominium and disburses their uses with tenants of the proposed residential dwelling.
The plaintiffs claim that the Public offering indicated a promise by the declarant to provide each condominium owner, as an LCE (Limited Common Element), three undesignated parking spaces for each 1,000 square feet of office space; with permission, upon discretionary approval by the declarant, to place reserved signs on the spaces. While the offering indicated that additional construction was contemplated, with common use of parking spaces, it also provided "but at all times at least three (3) parking spaces per one thousand (1,000) square feet of Suite shall be provided to individual Unit Owners, and ingress and egress to and from the CE shall be provided from Summer Street and Franklin Street. Temporary parking may be provided on contiguous land owned by BEC."
The Declaration of Condominium in Article 2, Section 12, Article 8 and Appendix A also reflected an assignment of undesignated parking spaces of approximately 3 spaces per 1,000 square feet of any unit. This would amount to 96 spaces.
In fact, however, there were never more than 49 spaces in the common area of the 1200 Summer Street Condominium and that parking had to be supplemented by using the unrelated Altuwich lot. Despite the fact that, under the present proposal, the plaintiffs would share in the use of 205 spaces, they argue that this causes the unit owners undue hardship which is unnecessary in order to effectuate the general plan.
The plaintiffs are correct in their generalized claim that since, "zoning ordinances are in derogation of the right of private property, and where exemptions appear in favor of the property owner, they should be liberally construed in favor of such owner." Devaney v. Board of Zoning Appeals, 143 Conn. 322,326, 122 A.2d 303 (1956). Also, the "Zoning Board stands between the public and the individual property owner to protect the latter from unnecessary hardship which owing to some affecting his land peculiarly, he would suffer when it not necessary for him to do so in order to effectuate the general plan of zoning adopted for the community as a whole." Goldreyer v. Board of Zoning Appeals, 144 Conn. 641, 645,136 A.2d 789 (1957); Finch v. Montinari, 143 Conn. 542, 545,124 A.2d 214 (1956).
However, these cases cannot be relied upon to prevent the Board from taking appropriate action to approve a plan that is CT Page 3068 in conformity with the general plan of zoning and does not in any way amount to an unlawful taking. These cases involve the issue of hardship as a justification for the granting of a variance. In fact, the Devany court upheld the granting of a variance to allow shared use of a parking space.
A fair reading of the Declaration does not indicate that any unit owner was guaranteed an exclusive or reserved right to any particular space. Even if that were so, the record indicates that the Declarant never afforded any more than 49 spaces to the 1200 Summer Street condominium. Under the proposed use the plaintiffs will share in the use of some 205 spaces.
It may be that the plaintiffs have a cause of action against the Declarant. It may be that their legal claim could, in an appropriate forum, be a basis for enjoining development. That is not an issue for the Zoning Board to resolve.
From the point of view of zoning issues and, because of the compliance of the application to rezone and the application for site plan approval with the Regulations, there was adequate evidence in the record to support the Board's decision.
This court cannot find that the plaintiffs have sustained in any of their claims the burden of establishing the defendant Zoning Board has acted unfairly in approving the applications or that the board acted illegally, arbitrarily and has abused its discretion.
For the reasons indicated, the appeal is dismissed.
NIGRO, JUDGE